# IN THE UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| ANTHONY CAROLLO,<br><br>　　　　Plaintiff,<br><br>v.<br><br>BOWTECH, LLC; HOYT ARCHERY, INC.; MATHEWS ARCHERY, INC.; PRECISION SHOOTING EQUIPMENT, INC.; BPS DIRECT, LLC D/B/A BASS PRO SHOPS; CABELA'S LLC; DICK'S SPORTING GOODS, INC.; JAY'S SPORTING GOODS, INC. D/B/A JAY'S SPORTING GOODS; KINSEY'S OUTDOORS, INC.; LANCASTER ARCHERY SUPPLY, INC.; ARCHERY TRADE ASSOCIATION, INC.; TRACKSTREET, INC.; AND NEUINTEL LLC, D/B/A PRICESPIDER HOLDINGS, LLC, F/K/A ORIS INTELLIGENCE,<br><br>　　　　Defendants. | Case No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Anthony Carollo ("Plaintiff Carollo") brings this class action complaint, individually and on behalf of all other similarly situated direct purchasers, against Defendants Bowtech Inc. ("Bowtech"); Hoyt Archery, Inc. ("Hoyt"); Mathews Archery, Inc. ("Mathews"); and Precision Shooting Equipment, Inc. ("PSE") (collectively "Manufacturer Defendants"), multi-channel sporting goods retailers BPS Direct, LLC d/b/a Bass Pro Shops ("Bass Pro Shops"); Cabela's LLC ("Cabela's"); Dick's Sporting Goods, Inc. ("Dick's Sporting Goods"); Jay's Sporting Goods, Inc d/b/a Jay's Sporting

Goods, ("Jay's Sporting Goods"); Kinsey's Outdoors, Inc. ("Kinsey's"); and Lancaster Archery Supply, Inc. ("Lancaster") (collectively "Retailer Defendants"), and industry trade association Archery Trade Association, Inc. ("ATA"), as well as TrackStreet, Inc. ("TrackStreet") and NeuIntel LLC, d/b/a PriceSpider f/k/a Oris Intelligence ("Oris") (collectively "Software Co-Conspirators") for their unlawful contract, combination, or conspiracy to fix the prices of Archery Products sold throughout the United States.

## INTRODUCTION

1. "Archery Products," as used herein, includes but is not limited to, (1) bows (compound bows, recurve bows, longbows, and crossbows) and their components; (2) arrows and their components (shaft, fletching, and nock, but not excluding the arrowheads themselves); (3) arrowheads (or arrowpoints) which includes broadheads and field points; (4) targets (bag targets, foam targets, and 3D targets); and (5) accessories (bow cases, arrow quivers, sights, scopes, and stabilizers). The Defendants in this case have the market power to successfully control pricing at an anticompetitive level in the Archery Products market. The Manufacturer Defendants are some of the most popular and well-known brands in the archery industry. Similarly, the Retailer Defendants are among the largest sporting goods retailers in the United States.

2. Based on concerns about competition in the industry lowering prices and impacting profit margins, Defendants acted collectively to implement and enforce minimum advertised price ("MAP") policies throughout the industry, which acted as price floors for Archery Products. These policies had no function other than removing true price competition and increasing profits for Defendants.

3. The ATA is the primary trade association for the Archery Products industry, with manufacturers, distributors, retailers, and other participants in the supply chain for Archery Products as its members, but not consumers. Manufacturer and Retailer Defendants exercised influence over the ATA, with Defendants occupying several seats on the ATA Board of Directors in every year of the conspiracy. The ATA was used to facilitate Defendants' conspiracy by encouraging and policing the adoption of MAP policies among all Defendants.

4. The ATA was also used to exchange competitively sensitive information in order to better monitor Defendants' adherence to the conspiracy. For example, the ATA conducts industry surveys, available free to members, which include extensive data on the Archery Products market. ATA also conducts surveys and presents compiled data at its annual members-only trade show for the express purpose of showing how ATA members' prices "stack up against your peers." Moreover, the ATA created opportunities for Defendants to meet in person and exchange sensitive information.

5. Defendants' conspiracy artificially raised, fixed, and/or maintained prices of Archery Products at supracompetitive levels. Plaintiff, on behalf of himself and Class Members, seeks to recover the overcharges they paid as a result.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, as this action arises out of Sections 1 and 3 of the Sherman Antitrust Act (15 U.S.C. §§ 1, 3) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26). This court further has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000 and at least one member of the putative class is a citizen of a state different from that of one of the Defendants.

7. Venue is proper in this District under 15 U.S.C. §§ 15 and 22, and under 28 U.S.C. §1391(b), (c), and (d) because at all time relevant to the Complaint: (a) Defendants transacted business, were found, or acted through subsidiaries or agents present in this District; (b) a substantial part of the events giving rise to Plaintiff's claims occurred in this District; and (c) a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District, including but not limited to: a. Defendant Bass Pro Shops is domiciled within this District; b. Defendant Cabela's is domiciled within this District; c. Plaintiff Carollo is domiciled within this District and purchased his Archery Products at issue within this District; and d. Plaintiff Carollo's purchasing records of his Archery Products at issue are located within this District.

8.     This Court has personal jurisdiction over Defendants because they: (1) transacted business throughout the United States, including in this District; (2) have substantial contacts within the United States, including in this District; and/or (3) are engaged in an illegal anticompetitive scheme that was and is directed at, and had and has the intended effect of causing injury to, persons residing in, located in, and/or doing business in the United States, including in this District.

9.     Defendants' activities were intended to and did have a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including in this District. Defendants sell their products and services in the continuous and uninterrupted flow of interstate commerce, including in, into, and from this District.

## PARTIES

### I.     Plaintiff

10.     Plaintiff Carollo is a resident of the state of Missouri. Plaintiff purchased Archery Products that were Manufactured by one or more of the Manufacturer Defendants and sold by one of the Retailer Defendants. Specifically, Plaintiff Carollo bought Archery Products sold by Defendant Bass Pro Shops. The Archery Products that Plaintiff purchased were sold at artificially inflated prices due to the conduct by Defendants as alleged herein. Plaintiff has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

### II.     Defendants

#### A.     Manufacturer Defendants

11.     Defendant Bowtech, LLC ("Bowtech") is a part of the larger entity, "Pure Archery Group," acquired by JDH Capital in 2022. Pure Archery Group advertises itself as the "leading archery manufacturer" and is made up of brands including Bowtech, Excalibur Crossbow, Diamond Archery by Bowtech, Black and Gold Premium Bowsights, Ripcord, TightSpot by Black Gold, and Octane. Along with its products, Pure Archery Group and Bowtech provide dealers with advertising services, business management services, and business administration assistance. Throughout the Class Period, Bowtech was a member of the ATA, produced and sold Archery Products subject

to MAP policies, and participated in Defendants' conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

12. Defendant Hoyt Archery, Inc. ("Hoyt") is a Utah Corporation with its primary place of business at 593 N. Wright Brothers Dr., Salt Lake City, Utah. Before Hoyt's merger and, thus, incorporation in Utah in 2006, it was incorporated and registered to do business in the State of Missouri in 1959 under "Hoyt Archery Company, Inc." Hoyt began its manufacturing of bows in Saint Louis, Missouri before eventually upgrading to a 150,000 square foot facility in Salt Lake City, Utah. Throughout the past century, Hoyt has claimed itself as an industry leader and world-renowned brand in archery and bowhunting. Throughout the Class Period, Hoyt was a member of the ATA, produced and sold Archery Products subject to MAP policies, and participated in Defendants' conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

13. Defendant Mathews Archery, Inc. ("Mathews") is a Wisconsin corporation with its primary place of business at 919 River Road, Sparta, Wisconsin. Mathews claims to be the largest bow manufacturer in the world. There are approximately 15 retail locations currently selling Mathews Archery Products within 100 miles of Kansas City. Throughout the Class Period, Mathews was a member of the ATA, produced and sold Archery Products subject to MAP policies, and participated in Defendants' conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

14. Defendant Precision Shooting Equipment, Inc. ("PSE") is a Delaware corporation with its primary place of business at 2727 North Fairview Ave., Tuscon, Arizona. In 2023, PSE was acquired by Heritage Outdoor Group, a holding company designed to acquire existing outdoor brands. Throughout the Class Period, PSE was a member of the ATA, produced and sold Archery Products subject to MAP policies, and participated in Defendants' conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

5

B. Retailer Defendants

15. BPS Direct, LLC d/b/a Bass Pro Shops ("Bass Pro Shops") is incorporated in the State of Delaware with its principal place of business in Springfield, Missouri. Bass Pro Shops describes itself as "North America's premier outdoor and conservation company," while its national headquarters store, located in Springfield, Missouri, offers more than 500,000 square feet of one of the largest assortments of outdoor gear, apparel, and gifts. In 2017, Bass Pro Shops acquired the outdoor brand Cabela's LLC. Bass Pro Shops has at least three storefront locations in the Kansas City metropolitan area. At all relevant times, Bass Pro Shops was a member of the ATA while having a representative on its Board of Directors consistently throughout the years at issue, sold Archery Products subject to a MAP, and engaged in the agreement to fix, raise, maintain, or stabilize prices of Archery Products sold in the United States.

16. Defendant Cabela's, LLC was a Delaware limited liability company with its primary place of business at 1 Cabela Drive, Sidney, Nebraska. In 2017, Cabela's was acquired by Bass Pro Shops. Since Bass Pro Shops acquired Cabela's in 2017, Cabela's principal place of business has been Springfield, Missouri. Throughout the Class Period and until its acquisition, Cabela's was a member of the ATA, sold Archery Products subject to MAP policies, and participated in Defendants' conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

17. Defendant Dick's Sporting Goods, Inc. ("Dick's") is a Delaware corporation with its primary place of business at 345 Court Street, Coraopolis, Pennsylvania. Dick's describes itself as the "leading omnichannel retailer" and serves athletes and outdoor enthusiasts in more than 850 store locations as well as online. It has at least four storefront locations in the Kansas City metropolitan area. Throughout the Class Period, Dick's was a member of the ATA, sold Archery Products subject to MAP policies, and participated in Defendants' conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

18. Defendant Jay's Sporting Goods, Inc. d/b/a Jay's Sporting Goods, ("Jay's Sporting Goods") is a Michigan corporation with its primary place of business at 8800 S.

Clare Ave., Clare, Michigan. Throughout the Class Period, Dick's was a member of the ATA, sold Archery Products subject to MAP policies, and participated in Defendants' conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

19.     Defendant Kinsey's Outdoors, Inc. is a Pennsylvania corporation with its primary place of business at 1660 Steelway Drive, Mount Joy, Pennsylvania. Throughout the Class Period, Kinsey's was a member of the ATA, sold Archery Products subject to MAP policies, and participated in Defendants' conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

20.     Defendant Lancaster Archery Supply, Inc. is a Pennsylvania corporation with its primary place of business at 2195A Old Philadelphia Pike, Lancaster, Pennsylvania. Throughout the Class Period, Lancaster was a member of the ATA, sold Archery Products subject to MAP policies, and participated in Defendants' conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

C.     Trade Association and Software Defendants

21.     Defendant Archery Trade Association, Inc. ("ATA") is a Virginia corporation with its primary place of business at 117 South Valley, New Ulm, Minnesota. ATA is a members-only trade association that works to further the economic interests of participants in the Archery Products industry. The ATA is a monolith in the Archery Products industry and is unique from trade associations in other industries in its sheer size and the representativeness of its membership: as of 2023, ATA boasted membership of over 2,500 businesses and organizations and stated that "all sectors of the industry are ATA members." Throughout the Class Period, the ATA was an active participant in the conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States. Similarly, throughout the Class Period, Defendant ATA facilitated exchanges among the Manufacturer and Retailer Defendants of detailed, non-public, competitively sensitive information regarding, including among other things, prices, capacity, demand, sales volume, future sales strategy, and other key pricing and sales metrics in furtherance of the conspiracy.

22.     Neuintel, LLC, d/b/a PriceSpider, f/k/a Oris Intelligence ("Oris") is a California corporation with its primary place of business at 20 Pacifica, Suite 1000, Irvine, California. Oris created and provided software to Defendants that allowed them to police and enforce their MAP policies in order to raise prices on Archery Products. In particular, Oris touts its MAP monitoring solution, Prowl, as "the world's most advanced MAP monitoring software." Oris also advises on the content of MAP policies and provides MAP violation letter templates. Throughout the Class Period, Oris participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

23.     TrackStreet, Inc. ("TrackStreet") is a Delaware corporate with its primary place of business at 9811 W. Charleston Blvd., Suite 2-776, Las Vegas, Nevada. TrackStreet created and provided software to Defendants that allowed them to police and enforce their MAP policies in order to raise prices on Archery Products. In particular, TrackStreet provides brands with digital tools to track and enforce pricing policies such as MAP policies. Features include on demand notifications of MAP violations and customizable messages to send to violators. In addition, TrackStreet also helps clients to formulate pricing policies, including MAP policies. Throughout the Class Period, TrackStreet participated in a conspiracy to fix, raise, maintain, or stabilize the prices of Archery Products in the United States.

D.     Co-Conspirators and Agents

24.     Defendants participated in the alleged conspiracy through the acts of their officers, directors, agents, partners, employees, representatives, affiliates, subsidiaries, and companies they acquired through mergers and acquisitions while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs, and for whom they are liable.

25.     Various persons and entities that are not named as Defendants participated as co-conspirators in the violations alleged herein and have performed acts in furtherance thereof. These other entities have facilitated, adhered to, participated in, aided and abetted, and otherwise acted in concert with Defendants in order to advance the

8

objectives of the scheme to benefit Defendants and themselves by artificially inflating the prices of Archery Products. Plaintiffs reserves the right to name some or all of these entities as Defendants. Defendants are jointly and severally liable for the acts of their co-conspirators whether or not they are named as defendants in this litigation.

## FACTUAL ALLEGATIONS

### A.     Relevant Market

26.     Defendants compete in the Archery Products industry for sales of Archery Products customers. The agreement, to exchange competitively sensitive information through various ATA-created channels, has enabled Defendants to reduce competition in the market for Archery Products.

27.     The principal relevant market to this claim is the Archery Products market. Associated products include but are not limited to: (1) bows (compound bows, recurve bows, longbows, and crossbows) and their components; (2) arrows and their components (shaft, fletching, and nock, but not excluding the arrowheads themselves); (3) arrowheads (or arrowpoints) which includes broadheads and field points; (4) targets (bag targets, foam targets, and 3D targets); and (5) accessories (bow cases, arrow quivers, sights, scopes, and stabilizers).

28.     There is a significant market for Archery Products in the United States. In 2020, there were an estimated 9.9 million bowhunters, 17.6 million recreational archers, and 5.4 million competitive archers above the age of fifteen. That same year, 13% of the U.S. population above thirteen years old had participated in bowhunting or archery disciplines in some manner.

29.     Archery Products, whether used for target shooting or bowhunting, are extremely costly, with the bows themselves being the costliest equipment. According to a 2023 ATA report, only 7% percent of bows cost under $300, while 28% cost between $300-$600, 16% cost between $600-$900, 23% cost between $900-$1,200, and 19% cost more than $1,200.

30.     The relevant geographic market is the United States and its territories.

9

31.     Defendants' conspiracy to raise Archery Product prices by adopting, implementing, and enforcing MAPs impacted consumers across the entire United States.

32.     Defendants and their co-conspirators possessed market power at all relevant times at the manufacturing, distribution, and retail levels in the Archery Products supply chain in the United States. Market power at each level of the supply chain made possible Defendants' scheme to significantly raise prices above competitive levels without risking losing a proportional number of sales. With substantial market power at each level, consumers could not shift to other companies or products to defeat artificial price increases.

**B.     Background of The Archery Trade Association (ATA).**

33.     The ATA is the primary archery trade group in the United States. The ATA is only open to archery and bowhunting businesses – not to consumers.

34.     ATA membership has risen from 505 members in 2000 to over 2,500 members in 2023. There are significant incentives to join the ATA: membership allows access to member-only benefits like attending the ATA Trade Show, use of the ATA Connect online forum, and a Member Directory.

35.     The ATA's website describes the process for a prospective member's application to be reviewed and verified by an ATA staff member. ATA membership is categorized "based on the verification documents provided. Each membership category description includes a list of the required verification documents for that category." ATA membership categories include: Retailers & Range, Manufacturers & Distributors, Archery Service Professionals, Media, and Sales Representative.

36.     Many ATA members are horizontal competitors. Among ATA members, 80% of its members belong to businesses along the Archery Products supply chain, including manufacturers, distributors, and retailers.

37.     ATA member-exclusive events and resources allow horizontal-competitors to discuss shared financial interests regarding Archery Products. The ATA's Board of Directors, the ATA Retail Council, the annual ATA Trade Show, and "ATA Connect" all

provided Defendants opportunities to meet and conspire about implementing industry-wide MAPs on Archery Products without the presence of consumers.

**C.    Defendants' Control of the ATA.**

38.    Defendants directly control the activities of the ATA. Defendants at each level of the Archery Products supply chain have occupied several seats on the ATA's Board of Directors in each year of the conspiracy. The ATA's Board "guides ATA actions and shapes the organization's policies and positions."

39.    As examples, Manufacturer Defendants BowTech, Hoyt, Lancaster, Matthews, and PSE, were all Board members in 2018 and 2019. Retailer Defendants BPS, Cabela's, Jay's Sporting Goods, and Kinsey's were all on the Board in 2015, with multiple of these Defendants on the Board in each year from 2014-2024.

**D.    The ATA Helped to Implement MAP Policies Among Competitors.**

40.    Members of the ATA's Board of Directors have openly supported strict MAP enforcement. One ATA Board member credited MAP policies and relentless enforcement as a big part of his company's high sales. He described his company's approach to enforcing MAPs by saying:

> We're doing everything we can to enforce our MAP guidelines, and people know we take it seriously. Every two weeks we actively go after everything we can find on the internet. We have an in-house guy who stays after it. You need to watch and learn how their operations work. When we figure out what they're doing we cut them off.

41.    The ATA, under the direction of its ostensibly competing Board members, has promulgated anticompetitive rules and guidelines, like MAPs, to artificially diminish competition and increase prices in the Archery Products market in the United States. As ATA itself acknowledged, "MAP policies level the playing field for all retailers, and eliminate the 'race to the bottom' that would occur if retailers endlessly competed to reduce prices."

42.    Defendants also used the ATA's "Retail Council" to further their anticompetitive scheme. In 2016, the ATA "revitalized its Retail Council to provide more guidance and support to the organization's retail members." The Retail Council, led by

members of the ATA Board of Directors was revitalized to "improve the industry's archery and bowhunting markets." There have been multiple Defendant Retail Council members each year of the conspiracy.

43.     Retail Council member and ATA's Executive Board Committee, and the general manager of Defendant Jay's Sporting Goods, described the need for the Retail Council by saying, "[w]e've needed an active and engaged platform for retailers to discuss important issues where the conversation is educational and productive . . . I'm appealing to every archery retailer to use our backbone to step up and be part of the solution."

44.     The ATA's Retail Council "meets weekly to discuss pressing issues raised during strategic-planning meeting[s]." This includes MAP policies and their enforcement. Kurt Smith, the ATA's Director of Industry Relations for the Retail Council has called MAP policies "probably one of the most talked about topics in the archery industry." His advice to retailers was to establish and enforce MAP policies so "distributors and retailers [can] catch violators [and] cut them out of the supply chain and force them to look for easier prey."

45.     Other Retail Council members have supported implementing MAP policies. Support for MAP policies came from one Retail Council member who said that Archery Products manufacturers "should create MAP policies and retailers should honor them . . . every business must work together as a group to be productive and profitable, which includes strong MAP policies and procedures." Another member of the ATA's Retail Council warned that "disobeying MAP policies . . . can have big consequences."

**E.     ATA Trade Shows Provided Opportunities to Conspire.**

46.     The ATA hosts an annual Trade Show, which is only open to ATA members. In 2011, the ATA implemented the membership requirement as an attempt to "prevent[] the attendance of those who undercut the ATA's pro shop dealers. . . ." ATA members widely supported excluding non-ATA-members from the Trade Show, and the ATA has remained steadfast on rejecting calls to make its Trade Shows more open.

47.     The ATA Trade Show brings together horizontal competitors across each level of the Archery Products supply chain. ATA trade shows are well-attended by industry participants: at the 2016 ATA trade show, "every major bow manufacturer was present and accounted for" and there were 1,168 retail and distribution buying companies in attendance."

48.     Jay's Sporting Goods General Manager Mark Copeland stated "[t]he Trade Show is the one place where nearly everyone in our industry does business . . . . It provides the perfect opportunity for retailers to talk face to face with Retail Council members. The retailer is in the trenches every day working to develop archers. To better our industry, we'd love to know what topics we should take to the ATA Board on your behalf."

49.     MAP policies are openly discussed at ATA Trade Shows. At one ATA Trade Show, a leading archery company posted placards around its booth reminding retailers "that it aggressively enforces its MAP policies."

**F.     The History of ATA's MAP Policy Creation and Enforcement.**

50.     Since at least January 1, 2014, Defendants agreed, combined, or conspired to artificially raise, fix, maintain, or stabilize prices of Archery Products in the United States. To implement their unlawful contract, combination, or conspiracy, the Manufacturer and Retailer Defendants – acting through and with the aid of ATA and co-conspirators – agreed to implement and strictly enforce MAP policies for Archery Products. The intent and result of this conspiracy was that prices for Archery Products were inflated to supracompetitive levels throughout the Class Period.

51.     In the years prior to the conspiracy, Defendants were concerned about price competition lowering prices and diminishing profit margins for Archery Products. As early as 2011, ATA members expressed concern about profitability in the industry with the ATA reacting to an email from one retailer stating "[w]e're concerned about MAP largely because it relates to the profitability of retail sales in our industry." Then-CEO and President of ATA Jay McAninch stated "[w]ithout MAP, many of these 'bricks and mortar' dealers won't be able to stay in business."

52.     Throughout the early 2010s, there was relatively high price competition throughout the industry. Responding to calls from the industry for a more active role in facilitating collective action such as MAPs, ATA offered a lukewarm response in 2011, stating "[t]he only action the ATA has taken or intends to take [regarding MAP policies] involves providing all ATA members a chance to have a voice and weigh in on MAP, which is a highly sensitive and potentially controversial issue." Around this time, one ATA Board member stated "[t]here is nothing the ATA can legally do when it comes to enforcement. There's no rule the ATA can set down and say, 'This is what you must do.'"

53.     But the pressure from ATA members, including the Manufacturer and Retailer Defendants, for the ATA to facilitate industry-wide action continued to grow. In 2014, in an abrupt about-face from its earlier position of passive listening to members – and, conspicuously, following the addition of Cabela's and Bass Pro Shops to the ATA Board of Directors – the ATA took the firm position that all members should institute and enforce MAP policies.

54.     ATA did not hide the fact that the addition of Cabela's and Bass Pro Shops as ATA Board members was a critical factor in ATA's ability to create collective action. ATA's Tom McAninch later described that:

> As I look back on the first year of the mega marts joining into our industry discussions, I have to say that if anyone other than [Cabela's] Tom Gallagher had been involved, we would not have had such a smooth and productive first year. With his cohort in crime, [Bass Pro Shops'] Dean Snelson, Tom quietly and in his unassuming, disarming way (which is his manner) allowed our Board members to see that the box stores [Cabela's and Bass Pro Shops] shared in our future and, more important, were serious about contributing to the success of the archery and bowhunting industry.

55.     ATA's new activist position on the issue of MAP policies following Cabela's and Bass Pro Shops' placement on the ATA Board of Directors is no mystery: with two of the largest Archery Product retailers now onboard, industry participants had much greater assurance that if they adopted and enforced MAP policies, their competition would as well.

56.     Memorializing the ATA's new position as facilitator of industry action on MAPs, ATA CEO Jay McAninch published a blog post on the ATA website titled "MAP: United We Stand, Divided We Fall." The post highlighted the ATA's view that industrywide adoption and enforcement of MAP policies was the key to continued profitability, and McAninch invited other manufacturers and retailers to agree to these policies. In part, the post stated:

> Unfortunately, this unprecedented interest [in archery equipment] has increased competition so much that some companies ignore MAP (minimum advertised price) just to make a sale. . . . MAP has been controversial largely because it's associated with price fixing, which means setting a minimum or maximum price for selling consumer goods. It's a complicated law, and recent Supreme Court decisions are causing ripples throughout lower courts and consumer-advocacy groups. . . . I believe to deal with this MAP issue, our industry must hold an open, honest dialogue about it. Everyone must participate because if we don't address the damage to our business model, we risk losing in the long term the sustained growth we've enjoyed. Since this involves everyone, the ATA is the right group to facilitate this discussion and provide the vehicle for the industry to unite behind constructive, positive changes. To ensure the industry addresses these issues, we've engaged the ATA Board of Directors; and the leaders of [buying groups] ARRO [Archery Range and Retail Organization], NABA [National Archery Buyers Association], NBS [Nation's Best Sports] and Sports Inc. We've also included manufacturers and distributors who expressed interest in MAP. In the months ahead, we'll facilitate a dialogue that examines what our industry's business leaders think can and should be done about MAP. To that end, the ATA will offer our MAP policy as a template that companies can use as a tool if they take action. We can't solve industry problems until we involve everyone in a conversation that shares concerns and develops a course of action. This first step basically "turns on the lights" because it requires everyone to share what they think about this issue's impacts on our industry. Once we have a clear sense of what MAP is about for ATA members, we can start a process that deals with it.

57.     In addition to the call for industry action, the ATA created a draft MAP policy for its members designed "to protect our companies from state and federal legal actions, while clearly informing other companies of their unilateral policy on product

pricing." ATA also created a checklist of key considerations "for forming – and enforcing – a sound, effective MAP policy."

58.     At the ATA Trade Show the following year, ATA hosted a lunchtime seminar on creating and enforcing MAP policies. The seminar was attended by approximately 60 ATA members, including manufacturers, distributors and retailers. A subsequent ATA newsletter reported "[i]f ATA members want to control the minimum advertised price (MAP) and/or the minimum resale price (MRP) of their products, each business must create its own policy statement, issue it to all resellers, and then enforce it consistently and forcefully with no negotiations."

59.     The newsletter described that the ATA counselled those members – who were competitors throughout the Archery Product supply chain – on "crafting customized policies to protect each product's publicly advertised minimum price. That price is protected whether it's posted online, displayed outside on store-front signs or windows, or advertised in fliers, newspapers, magazines, TV or radio. Companies that don't set MAP/MRPs and enforce them risk profit losses as well as diminish their brand."

60.     The following February 6, 2015 newsletter further continued the MAP training given to those attendees, presumably in order to reach manufacturers and retailers who did not attend the in-person training. It noted, "[t]he ATA cannot set or enforce MAP/MRP policies for the industry because it would violate antitrust laws. However, the ATA can provide help and information so individual manufacturers can craft their own policies, which the companies must then enforce themselves."

61.     The training and newsletter also built on the sample MAP policy that ATA offered in 2014, including a "three-step plan . . . to help ATA-member manufacturers and distributors adapt a sample policy for their own use."

62.     This push for industry-wide adoption quickly met with success, with Kinsey's announcing a new and updated MAP Policy in June of 2015. In a press release in Archery Wire, Kinsey's explained:

> MAP policies exist to benefit both retailers and manufacturers by elevating
> perception of brand value, which leads to increased margins for retailers.

Kinsey's stands behind manufacturers in their implementation of minimum advertised pricing to protect the interests of their brands, as well as margin integrity within the retail network.

63.     The June 2015 Archery Wire article also highlighted another central component of Defendants' conspiracy: policing the conspiracy. Because many product resellers such as smaller pro shops purchase Archery Products from distributors or retailers (such as the Retailer Defendants) as opposed to directly from the manufacturers, the price floors established by the MAP policies would only be effective if the distributors or retailers vigilantly policed the manufacturers' MAP policies. The article explained that, as part of its MAP policy updates, it would police the MAP policies of Archery Products manufacturers, such as TenPoint Crossbow Technologies. TenPoint Vice President stated "Kinsey's has done a great job of backing TenPoint's enforcement of its MAP policy, thus strengthening the TenPoint brand as well as helping the retailers maintain a solid profit margin. This MAP enforcement is important in order keep the retailer base, and archery as a whole, healthy."

64.     A prime example of this kind of policing up and down the supply chain is the MAP policy enacted by T.R.U. Ball Archery Releases/Axcel Archery Sights ("T.R.U."), instituted in 2017, which provided punishments for "MAP Violators" at two levels of the supply chain. For retailers who sold T.R.U. Archery Products., the following conditions applied:

New MAP Violator:
A warning will be issued. Violator will be evaluated in approximately two weeks to determine if they have raised prices to MAP levels.

Repeat MAP Violator:
First repeat infraction – Violators who have been notified that they are below MAP pricing within the last six months will be given a 48 hour warning to raise prices to MAP levels. Violators who have not raised prices to MAP levels after this time period will be placed on the T.R.U., Inc. Do Not Sell List, which asks each distributor to immediately block supply of product, for 30 days.

Second repeat infraction – Violators who have been listed on the T.R.U., Inc. Do Not Sell List within the last six months who knowingly lower their prices below MAP level for a second time will be placed on the T.R.U., Inc. Do Not Sell List, which asks each distributor to immediately block supply of product, for 60 days.

Three or more repeat infractions – Violators who have been listed on the T.R.U., Inc. Do Not Sell List within the last six months who knowingly lower their prices below MAP level for more than two times will be placed on the T.R.U., Inc. Do Not Sell List, which asks each distributor to immediately block supply of product, for the greater of 60 days or until prices have been raised to MAP levels for at least 30 days.

For distributors who sold T.R.U. Archery Products to other resellers (such as Cabela's supplying a small pro shop), additional conditions applied:

Distributor Violators:
T.R.U., Inc. will be using contacts from around the United States to purchase products from sources who are known to be violating MAP levels.
First infraction – Distributors who are found to supply a company that is currently on the T.R.U., Inc. Do Not Sell List will be added to the T.R.U., Inc. Do Not Sell List for 30 days.

Second infraction – Distributors who are found to supply a company that is currently on the T.R.U., Inc. Do Not Sell List will be added to the T.R.U., Inc. Do Not Sell List for 60 days.

Third infraction – Distributors who are found to supply a company that is currently on the T.R.U., Inc. Do Not Sell List will be added to the T.R.U., Inc. Do Not Sell List indefinitely.

65.    In short, those who did not comply with the MAP policies would lose their supply of Archery Products.

66.    In a June 23, 2015 post on industry forum Archery Talk, one retailer remarked "My hope is that the ATA association [sic] is successful in establishing an industry wide rule set that will be enforced industry wide."

67.    Reflecting on the impact of the ATA's 2014 push for industry-wide action on MAP policies, the ATA published an article on March 15, 2016 titled "ATA Members

Weigh in on MAP," which opened, quoting McAninch's 2014 blog post and writing "More than one year later, there's still good news and bad. However, the ATA and its member companies have worked tirelessly to discuss, craft and enforce MAP policies that could help manufacturers, retailers and the industry."

68.     The article quoted several industry participants, beginning with Mike Ellig, founder of Archery Products manufacturer Black Gold Inc. Ellig cited the ATA's efforts as pivotal in allowing his business to implement MAP policies and maintain higher prices:

> I was ready to charge ahead, but as a small-business owner, I didn't know where to start and I didn't have two months to create a policy from scratch. Jay [McAninch] connected me with the ATA's lawyers and provided resources I wouldn't have found otherwise out here in Bozeman, Montana. Black Gold's MAP policy has been in place about two years. Ellig said he notices more companies adhering to the MAP policy, and also has "cut off" people who wouldn't abide by it.

69.     Ellig also noted that collective action on MAP policies would benefit the industry as a whole through higher prices, even if it meant that individual manufacturers or retailers sacrificed profits in the short term. The ATA article reported: "Enforcing MAP is up to every individual company," Ellig said. "It's a lot of extra effort. A lot of people will decide it's not worth the hassle because it's so much work. Some won't take time to do it, but the long-term impact of doing it right is 10 times greater than the short-term impact of getting a sale for the archery industry."

70.     One Archery Products retailer and member of buying group ARRO stated "[w]e have to educate our dealers about holding to the MAP as much as they can . . . [o]therwise (violators will) destroy the brick-and-mortar stores."

71.     This same retailer noted two potential "MAP Issues," (1) "Many sellers dodge MAP by selling a product and offering a $50 coupon or gift card. They sell the product so low that other retailers can't compete;" and (2) "Some manufacturers take the time and trouble to create MAP policies, only to find they can't enforce them. That's really disappointing."

72.    This retailer's comments are especially notable because they clearly reveal the true purpose of MAP policies within the Archery Products industry: to stifle any free competition that would result in better prices for consumers. They are also notable for the frank conclusion offered about the role of the ATA in the conspiracy: "It will take the ATA's power to educate retailers and manufacturers about the importance of upholding MAP policies," Stubstad said. "The cost of business continues to rise. For businesses to survive, we can't give our products and services away. Manufacturers must approach this problem like it's enforceable and be determined to enforce their policies."

73.    Ben Summers, director of operations at T.R.U. and vice chairman of the ATA Board of Directors discussed MAP policies from the perspective of a "large manufacturer." Chief among Summers' concerns was that, without active enforcement, competitors would "cheat" on the agreement and steal sales by offering a better price. Summers stated "[i]f I'm really good at keeping my products at the MAP price, and I have a competitor who isn't keeping a MAP policy, and their product costs less than mine, I can lose lots of sales." But Summers noted that the ATA played the critical role of enforcer: "Jay McAninch always talks about shining light in dark corners so people can be seen for what they're doing, and be held accountable," Summers said. "ATA's lawyers have shone that light by offering information on how to structure a MAP policy, providing examples of policies from other industries, and explaining different tactics some companies use.

74.    Speaking from the perspective of a sales representative, Bruce Hudalla opined: "MAP is a good thing for the archery industry . . . . It keeps a level playing field and allows people to compete on product knowledge and customer service. As a sales rep, I support MAP because it maintains the value of products and allows my customers – retailers and manufacturers – to operate at profitable margins."

75.    Hudallah also stressed the central role of ATA in facilitating coordinated industry action on MAPs, stating "ATA has done an excellent job getting all the main players from retailers to manufacturers to sales reps in the same room and presenting the facts and sample policies," and that "[i]f you have a [MAP] policy, it must be enforced."

76. As another example, Jay Scholes, co-founder of marketing firm Outtech, stated "we're responsible for upholding our sport, for making sure our retailers make money, and ensuring manufacturers also make money. MAP is a good thing for our industry." He concluded, "If we all believe we're in this business because we love the outdoors, we have a responsibility to uphold MAP to strengthen the industry."

77. The ATA continued to strengthen its push for coordinated MAP policies. At the 2016 ATA Trade Show, one Archery Products retailer gave a presentation on MAP policies, remarking that "many dealers might not know how to price certain products, but MAP helps them learn what profit margin they need to make their business ssurvive," and "We have to educate our dealers about holding to the MAP as much as they can . . . [o]therwise [violators will] destroy the brick-and-mortar stores." One attendee at the 2016 Trade Show remarked, "[t]he archery industry is uniting as one, understanding we are all in this together, and that unity is ultimately what will help us grow."

78. Also in 2016, ATA rolled out a new compendium of resources for "Members Interested in MAP Policies," which included "ATA [] resources about creating a MAP policy for your company" and which were "available only to ATA members, and are included in your membership."

79. In May 2016, the ATA Retail Council met for a "strategic-planning" meeting in Minneapolis, Minnesota, which included nearly 40 ATA Retail Council members. Among the leaders of the Retail Council at this summit was the Council Chairman, Jay's Sporting Goods General Manager Mark Copeland. In an August 30, 2016 article in Inside Archery, ATA President Jay McAninch stated about this summit that "Things are changing . . . . It's clear from our strategic planning meeting that our industry understands that its success depends largely on the success of archery and bowhunting retailers. The ATA's Retail Council is rejuvenated, highly engaged and ready to help forge a better future for everyone in our industry." Copeland emphasized the role of the Retail Council as a conduit for collective industry action: "I keep hearing

that retailers are the industry's backbone. I'm appealing to every archery retailer to use our backbone to step up and be part of the solution."

80.     Industry participants continued to emphasize the need for vigilant industry-wide enforcement of MAP policies. In early 2017, ATA published an article titled "ATA Members Speak: Marketing, MAP, and What's Next." Asked the question "Minimized [sic] Advertised Price enforcement is a hot topic these days. What's your take on MAP and why?" one Archery Products retailer stated: "We appreciate MAP policies and the companies that enforce them. When a company competitor enforces a MAP policy, we can stay profitable without having the showroom for a competitor who wants to undercut pricing. We started to discontinue stocking manufacturers who do not have MAP policies and don't enforce them, and those who supply Amazon."

81.     Asked "[i]f you could play king/queen for a day, what needs to happen in the archery industry to benefit your company the most?" this same retailer stated "We, the individual, brick-and-mortar retailers need quality products with solid margins enforce margins backed up by advertising to consumers. We also need manufacturers who are willing to enforce their MAP policies, not those who just say they have MAP policies but don't do anything about price games."

82.     In July 2017, the ATA Board of Directors met at the headquarters of Hoyt and unanimously voted to add two seats to the Board for representatives from Archery Products buying groups the National Archery Buyers' Association ("NABA") and the Archery Range and Retailers Organization ("ARRO"). With those additions, the ATA Board of Directors in 2017 consisted of "three pro shops, two buying groups, one sales representative, two multi-channel retailers, and 12 archery and bowhunting manufacturers and distributors."

83.     ARRO's executive secretary said of recent ATA efforts, "ATA has been a force in growing archery and bowhunting in recent years . . . . It's been working to help retailers be more profitable." She also expressed her hope that the Board appointment would strengthen the relationship and communication between ARRO, ATA and manufacturers.

84.     Shortly after that meeting, ATA published an article titled "MAP: What is it? Why Does it Exist?" The article continued the directive from the ATA – made up of representatives of some of the largest competing retailers, manufacturers, and other industry participants – that they should adopt MAP policies and providing the assurance that their competitors will do the same.

85.     The article explained, "[i]n effect, MAP policies level the playing field for all retailers, and eliminate the 'race to the bottom' that would occur if retailers endlessly competed to reduce prices. The policies also help manufacturers protect their integrity, maintain their worth and stabilize their brand." The article lamented that price competition could cause "small-business owners with brick-and-mortar shops [to] lose business because they can't compete or compete with online markets where consumers can easily compare prices with their smartphone or desktop computer," and that eventually price competition could cause the "archery industry" to "suffer."

86.     The article again highlighted ATA's central role in the conspiracy, as well as urging members to get involved:

> The Archery Trade Association's Board of Directors and its Retail Council to members are discussing how to solve those problems and ensure the longevity of brick-and-mortar retailers, who form the industry's core. ATA members regularly weigh in on MAP, and the conversation continues. While the ATA works with manufacturers to establish and enforce good MAP policies, you can get involved in several ways.

87.     ATA provided a list of action items for members to address the industry concern with price competition. First and foremost, the ATA encouraged members to "[s]tart by following good MAP policies, which means those enforced by manufacturers. ATA also stated, " If a manufacturer doesn't have a policy, or doesn't enforce its policy, call the company and express your concerns. Encourage them to work with the ATA to develop a MAP policy or improve their current policy."

88.     In a textbook example of conspiratorial signaling from one of the largest participants in the conspiracy, the article stated "Ryan Shutts, Cabela's merchandising director and an ATA Retail Council member, thinks manufacturers should create MAP

policies, and retailers should honor them," and "Shutts said every business in the industry must work together as a group to be productive and profitable, which includes strong MAP policies and procedures."

89.     Finally, the article emphasized the supracompetitive profits that the industry could realize – in the form of higher prices to consumers – by acting in concert to institute and enforce MAP policies. It noted:

> MAP policies "help retailers stay in tune with the market and margin expectations. In other words, if you understand and follow a manufacturer's MAP policy, you'll be better positioned to make more money and run a successful business;"

> "If you follow MAP and work within that price structure . . . [t]hat puts you in a better position financially than cutting the cost of a product and disobeying MAP policies, which can have big consequences;" and, "When you're part of the solution, you'll make more money."

90.     In October 2017, ATA expanded its MAP-related offerings by launching a "MAP Resource Library" exclusively for ATA Members, which shared and showcased the MAP policies of its manufacturers. The ATA press release announcing this new resource stated:

> ATA staff are compiling manufacturers' MAP policies and posting them in the Members-Only area of the ATA website. This MAP Resources Library helps retailers learn which manufacturers have MAP policies, and helps retailers to understand and comply with them. Several policies are already posted, and the ATA will add more as manufacturers provide them.

> If you're a manufacturer and need help monitoring how well retailers adhere to your MAP policy, the ATA can help you, too. MAP policies are only effective if they're enforced, but monitoring and enforcing them can be challenging. To help, ATA has secured special discounts with firms that monitor and enforce MAP policies. These discounts are available only to ATA-member manufacturers.

> The ATA has asked all ATA-member manufacturers to provide their policies so they can be included in the MAP Resource Library. If your company has a MAP policy, or if you have questions, contact Wendy Lang, ATA membership manager, at wendylang@archerytrade.org. To capitalize on these ATA-member benefits, join the Archery Trade Association today.

91.     This centralized repository for the MAP policies of all ATA members served as a *de facto* conspiratorial hub where competitors functionally signed their name to an agreement not to compete with one another on price for Archery Products. In a truly competitive market without the facilitation of the ATA, these industry participants could not institute price floors on their products because they could not be certain that their competitors would not undercut their prices and steal business. But by compiling and publishing the MAP policies of all ATA members, the ATA also essentially created a list of competitors who had agreed not to undercut each other below MAPs floor price.

92.     Moreover, ATA's reveal of this new library of members-only resources also serves to highlight how, by 2017, the ATA had completely abrogated its earlier role as a neutral trade association, and instead had long-since become an active, knowing, and intentional participant and facilitator of the price-fixing conspiracy.

**G.     ATA's Use of Digital Tools to Police the Conspiracy.**

93.     The firms that ATA referred that "monitor and enforce MAP policies" were co-conspirators TrackStreet and Oris. Both of these companies featured digital platforms that enabled users to track and enforce pricing policies, including MAP policies. In a since-deleted image hosted on the ATA website, Oris advertised "Actionable insights that preserve pricing integrity – from the outdoor industry to housewares, and everything in between, ORIS helps manufacturers protect their brands."

94.     In a 2019 ATA article, ATA described TrackStreet and Oris as providing "'web crawlers' and other high-tech software to scour the internet for MAP violators." It further described that the Software Co-Conspirators "know how to find out who's violating [MAP], identify their fictitious names, and track them as they move around to undercut our members." In short, Trackstreet and Oris provided an online, constant source for policing adherence to MAP policies.

95.     Upon information and belief, the services for which ATA had negotiated a discount from Oris and TrackStreet and which it recommended to members included not just identifying MAP violators, but sending violation notices to all MAP violators and

tracking information on seller violations such as when and how often the seller violated MAP.

96.     The price for these services without any discount can exceed $1,000 per month, and for a mid-size company in a similar industry exceeded $20,000 per year. Archery Products manufacturers, retailers, or other industry participants would have no reason to pay for such expensive services if Oris and TrackStreet did not help those participants become more profitable – here, by helping raise the price of Archery Products industry-wide and by punishing participants who tried to undercut on price. Thus, the financial viability of Oris and TrackStreet is inextricably linked to the industries to which they provide their services: if Oris and TrackStreet do not help industry participants raise prices, those participants will stop subscribing. Based on this and other information alleged herein, Oris and TrackStreet were aware of and profited from their role in the conspiracy, and accordingly share the antitrust liability with the other Defendants.

97.     Near the same time as the MAP Resource Library, ATA also created a new page on its website specifically regarding MAP policies. The webpage – deleted at some point in 2021 – described how a MAP policy "ensures all retailers compete fairly and evenly on service instead of price." It also took the unequivocal position that "[r]etailers are responsible for knowing MAP policies and adhering to them."

98.     In November 2017, ATA released another service: ATA Connect, which was described as "a new online discussion community created exclusively for ATA members. It's a safe, confidential space to network and solve industry challenges through constructive discussions." In an ATA article published to announce the release, the ATA stated "[u]sing ATA Connect, work with your peers to find solutions that boost business and benefit the industry by tackling topics like MAP policies, buying patterns, and setting appropriate charges for service work." A subsequent blog post by ATA CEO Matt Kormann verified that ATA members did, in fact, use ATA Connect to discuss MAP policies: "The topic atop the list of many ATA members during and immediately after #ATA2019 has been internet retailing and minimum advertised pricing. ATA Connect

participants have been discussing both topics, with retailers and manufacturers alike vocal in their opinions." In other words, ATA created a private message board where competitors could easily coordinate MAP pricing, as well as other confidential topics such as coordinating supply. In 2019, ATA noted that "[t]he hottest current topic on ATA Connect is managing inventory as new compound bows hit the market. Retailers are also discussing ways to communicate with suppliers to ensure positive, profitable partnerships."

99. In May 2018, the ATA Retail Council met near Alma, Wisconsin, where they discussed topics they anticipated retailers would discuss on ATA Connect, including sensitive and confidential elements such as: minimum advertised price policies, new-product release dates, setting profitable sales margins, evaluating your store's market value, boosting profits from lanes and lessons, and the question of whether online sales hurt business.

100. ATA also created a specific channel for ATA-member retailers called ATA Connect's Retail Growth Interact. The channel was "exclusive to ATA-member retailers, which ensures it's productive and solutions-focused." The purpose of this channel was described by ATA as: "a great place to share ideas and ask questions about the topics that matter most to your business, including buying patters [sic], profit margins and what to charge for services. Together we can address industry challenges, boost your bottom line, and promote archery and bowhunting."

101. Shortly after the release of the Retail Growth Interact, ATA announced that it was releasing My ATA Network, which was another members-only channel described by ATA the following way: "Distributors, manufacturers, retailers and other ATA members have different business goals, objectives and operations. That's why the ATA is creating My ATA Network, an open forum that helps all ATA members work together to grow archery and bowhunting participation while boosting their businesses. My ATA Network on ATA Connect will debut before January, making it available for the 2019 ATA Trade Show. The Retail Growth Interact community is reserved for ATA-member retailers, but they'll also have access to the My ATA Network."

102. The purpose of ATA Connect and its various channels was the clandestine exchange of competitively sensitive information on Archery Products and related services between competitors.

103. Besides encouraging industry participants to exchange information covertly through ATA connect, in 2018, Retail Council Members "agreed they must encourage more retailers to share profitable tips and strategies for sales and marketing," including by soliciting and sharing competitive sensitive information directly with competitors

104. One Retail Council member stated "[t]his isn't about retailers fighting with manufacturers and telling them how to do their jobs; it's about sharing ideas that help retailers and manufacturers succeed." Another Retail Council Member put a finer point on it: "We want retailers to chime in with ideas on what works at their stores, what doesn't, and why," Piersol said. "How much do you charge for labor? What's selling this year in your area? Are the same products selling in Pennsylvania, California and Michigan? They can help each other a lot."

105. In 2018, ATA released another new related service, called ATA Connect: Polls, through which "ATA staff conduct polls on ATA Connect every other week." The polls are "measures of where ATA members stand on industry issues" and by answering "members learn how they align with others." Additionally, ATA described that "[t]hese polls also help the ATA's Retail Council and other committees see if they're representing their peers when working with the ATA Board of Directors." Tools such as ATA Connect: Polls allowed Defendants to further coordinate and reinforce their conspiracy.

106. By at least 2019, Defendants had achieved sufficient coordinated industry participation to make MAP policies effective at artificially raising prices. In a 2019 ATA article, T.R.U.'s Ben Summers stated that "good MAP policies and relentless enforcement played a big part in the company's 'really high' sales the past year."

107. In order to continue to enjoy these high profit margins, ATA stressed the need for constant policing of MAP and exposing and punishing retailers or distributors who attempt to undercut competitors' prices. ATA's Director of Industry Relations, Kurt Smith, described that monitoring MAP adherence was "a constant whack-a-mole or cat-

and-mouse game with people who just want to make a quick buck," and people "who aren't worried about long-term profitability."

108.    Smith also highlighted the continued need for competitors at all levels to work together in order for the MAP policies to keep raising prices. He stated "[t]he big thing will always be communication and teamwork," because "[e]nforcing MAP will never get easier. That's why it's so important for ATA members to work together as much as possible."

109.    On March 20, 2019, Smith hosted TrackStreet's Ryan Erickson on the official ATA podcast Beyond the Bow on an episode titled "MAP Policies and Enforcement." Erickson commented on how it was only through collective action that the Archery Products industry was able to effectively raise prices through MAP, explaining "nobody wants to be the first soldier through the way . . . they tend not to turn out too well . . . [but] as soon as a couple of big brands hop on, then all of a sudden that provides an umbrella coverage for the rest of the brands to move forward."

110.    Defendants continued to use the ATA and other industry publications to communicate their commitment to the cause of raising prices through MAP policies. In 2020, ATA CEO Matt Kormann published a blog post titled "CEO Blog: Importance of MAP" and wrote:

> Buying habits have also changed for consumers and business owners. We can't turn back the clock and delete the internet – no matter how appealing that might sound, especially to parents. That evolution keeps MAP in a spotlight. With just a couple of taps on an iPhone we can pull up our competitors' retail pricing. For pro shops, that means it's easier to identify potential violations of MAP policies.
>
> The first reaction might seem obvious: Manufacturers with solid MAP policies should be out there policing their retail channels. The reality is more complex. Doing so takes time and resources during a stretch in our industry where both are at premiums. It might be even more simple to assume every retailer should just follow those policies, but as long as we live in a free and competitive market, some business owners will make decisions others might not like.

111.    The August 2019 edition of Inside Archery featured a front-page story titled "Kinsey's: Branching Out, But True to Its Roots," which quoted Kinsey's executives reaffirming their commitment to industry-wide enforcement of MAP policies. The article explained: "Kinsey's is using its far-reaching influence to help enforce MAP policy. This effort is also geared towards helping dealers and strengthening the industry at large. 'We work closely with our vendor partners and retail partners to monitor and enforce MAP policy,' [Kinsey's CEO] Justin Gorman said. 'There are a lot of methods out there, and there really is no simple solution, but by working together, we have the ability to bring positive change to the industry.'"

112.    Kinsey's Justin Gorman also described Kinsey's punishment of industry participants who allegedly violate MAP policies, stating "[w]hen someone breaks the rules, they lose the ability to buy that product from us. They also can't buy it online or through the manufacturer because we work closely with vendors to build a 'do-not-sell' list."

113.    The Inside Archery article touted the continuing need for collective action in order for the MAP policies to have the intended effect of raising price of Archery Products market-wide. It quoted Justin Gorman saying, "Everyone needs to pull their own weight, but we are doing all we can to help protect the honest shops that don't violate MAP, which are the shops that actually get hurt when someone else breaks the rules."

114.    Similar stories in industry publications such as Inside Archery continued to serve as a means for Defendants to reaffirm their commitment to the conspiracy and signal their assurances to competitors that if they too joined the conspiracy, they would not be risking another firm undercutting them on price. In March 2020, for example, PSE General Manager David Kronengold was quoted saying "[t]he industry is in a hard place, but we are not going to wait for anyone else to fix it for us. We are going to make it part of PSE's business strategy to drive improvement and fix everything we can. And we are doing all of this while fully acknowledging that if we are successful, then we are also benefiting our competitors."

115.    In a particularly candid explanation of the continuing conspiracy, industry sales consultant firm MWS Associates, Inc. was quoted in an ATA website article stating: "We're all competitors, and we compete against each other throughout the season and the years. But we must grow the numbers in the industry, and to do that we must work together . . . . Realistically, the ATA does so much for the growth and health of the industry, and I think that largely goes unrecognized. Although we're all competitors in the industry, we all have the same goal, and that's to help the industry succeed. The ATA works on that, and reminds us to see the bigger picture."

## H.    The ATA Facilitated Sharing of Competitively Sensitive Information.

116.    In 2022, ATA announced the release of the ATA Retail Business Tracker Survey, which was described by the ATA as follows: "As an archery business, data and reliable facts play a pivotal role in making critical decisions. To address that need, the ATA is launching a new quarterly survey to gain insight from retailers across the country to help members adapt to changing conditions regionally as well as to compare your business to what is happening nationally."

117.    In a subsequent article on the ATA website, the organization explained the process and aims of the survey: "The ATA puts together a Retail Trend Tracker survey each quarter and sends the questionnaire to retail members in order to curate relevant and informative data about the state of the industry according to the retail shops' experience. The ATA then shares the data gathered from the survey with distributors, manufacturers and retailers in an easily digestible report. The data is provided collectively for each region." This article confirmed the point of the survey: sharing competitively sensitive information among the members of the conspiracy.

118.    The article, titled "ATA Members Capitalize on Data Shared in ATA's Retail Trend Tracker Survey," stated that it intended for its members to use the survey data to compare their businesses with regional competitors, explaining that "[s]ince each region of the country is represented in the report, retailers and manufacturers can study any discrepancies in the results and adjust accordingly, based on the data in their region."

119.     Another ATA article, titled "Download the Latest ATA Retail Trend Tracker Survey for Valuable Data about Market Trends," provides insight into the granularity of the information provided in these surveys, which includes: the percentage of merchandise sales by product category, types of bows, price ranges of bows, customer experience level, and foot traffic; seasonal questions regarding what's trending and what's not, business challenges and what customers are saying; which price range customers are gravitating toward, as well as the percentage of sales of each product type: bows, arrows, accessories, and services such as coaching or bow technician work.

120.     Altogether, the ATA boasts that "[t]his data allows you to see how your shop compares to your peers. For manufacturers and retailers, ATA advertises "[they] can also get a sense of how much inventory they should have on hand. Comparing your inventory with that of other shops in your region can help you determine whether what you have is working or give you a sense of how you might increase or decrease it."

121.     ATA stated of the Retail Trend Tracker Survey that, "[t]ogether, our members are archery and bowhunting's most powerful and collective voice. Our hope is that this information will provide critical industry guidance as you look to thrive and adapt to emerging trends."

122.     Until some point in 2024, the ATA Retail Business Tracker Survey was available exclusively for ATA members. As described supra, membership is only available to industry participants such as retailers, manufacturers, and distributors, and explicitly excludes consumers. To become a member, applicants are required to submit several forms of identification proving that they are an industry participant. Accordingly, for much of its existence, the ATA Retail Business Tracker Survey was compiled from information gathered from the ATA about its members and distributed exclusively to competing retailers, manufacturers, and distributors.

123.     In 2024, the ATA made these reports available to non-members for between $200 and $500 per report, while the reports were still available to all members free of charge. Thus, until as recently as 2024, these reports were made available only to competing retailers, manufacturers, and distributors and were completely unavailable to

32

consumers. Courts have commented on the anticompetitive effects of private information exchange between competitors: "Public dissemination is a primary way for data exchange to realize its procompetitive potential."

124.    ATA is transparent about how it intends its members to use the information gathered from member surveys, such as that contained in the Retail Business Tracker Survey. For example, in a similar report gathered from data compiled from ATA Retail Council Member surveys and distributed at the ATA Trade Show, the ATA that the chart could be used to "compare your service and labor rates to industry averages so you can see how you stack up against your peers." An accompanying ATA article demonstrated how this is precisely how members used this data. Asked "[w]hat do you charge for your services," one retailer replied "Not enough. I was happy to see the bow-tech price comparison chart at the ATA show this year, and have intended to analyze what we charge and restructure it." The article concluded by signaling to ATA members, "Don't sell yourself short. If you provide quality service on time, price the work accordingly."

I.    **Sharing Sensitive Information is Indicative of Conspiracy.**

125.    In a competitive market, sharing sensitive business information would allow industry participants to undercut each other on price and steal market share. Thus, it would be contrary to a firm's self-interest to share such information with competitors. In a cartel, however, access to this kind of information serves as reassurance that cartel members are adhering to the conspiracy and declining to pursue co-conspirators' market share.

126.    The "Guidelines for Collaborations Among Competitors" issued in 2000 by the United States Department of Justice ("DOJ") and the Federal Trade Commission ("FTC") provide:

> Agreements that facilitate collusion sometimes involve the exchange or disclosure of information.... [I]n some cases, the sharing of information related to a market in which the collaboration operates or in which the participants are actual or potential competitors may increase the likelihood of collusion on matters such as price, output, or other competitively sensitive variables. The competitive concern depends on the nature of the information shared. Other things being equal, the sharing of information

relating to price, output, costs, or strategic planning is more likely to raise competitive concern than the sharing of information relating to less competitively sensitive variables.

127. In 2010, the United States submitted the following comments to the Organization for Economic Cooperation and Development on the legal approach to information sharing among competitors: "[C]ertain information exchanges among competitors may violate Section 1 of the Sherman Act, which prohibits a 'contract, combination ... or conspiracy' that unreasonably restrains trade. The antitrust concern is that information exchanges may facilitate anticompetitive harm by advancing competing sellers' ability either to collude or to tacitly coordinate in a manner that lessens competition. Thus, for example, exchanges on price may lead to illegal price coordination."

128. Four years later, in 2014, the FTC issued general guidance entitled "Information exchange: be reasonable," confirming that "when competing companies seek market intelligence by exchanging price or other commercially sensitive information, that may facilitate collusion or otherwise harm competition and consumers in violation of the antitrust laws."

129. In February, 2023, Doha Mekki, then-Principal Deputy Assistant Attorney General for the DOJ's Antitrust Division noted that "exchanges facilitated by intermediaries can have the same anticompetitive effect as direct exchange among competitors."

130. The ATA-created channels of communication between competitors described here, including the ATA Trade Shows, ATA Connect, ATA Retail Business Tracker, have been vehicles through which Defendants – competitors in the Archery Products market – routinely exchanged competitively-sensitive information with the intention and effect of thwarting price competition and increasing profit margins industry-wide.

**J.      Defendants' Inflation of the Price of Archery Products Was Successful.**

131.    Defendants' agreement to artificially raise, fix, maintain, or stabilize prices for Archery Products and to exchange competitively sensitive information regarding Archery Products has had the intended effect of artificially inflating the prices for Archery Products paid by consumers.

132.    Defendants' horizontal agreement between competitors to raise prices through the implementation and enforcement of MAP policies in fact raised prices through two mechanisms. First, MAP policies, when adhered to by a critical mass of horizontal competitors, eliminate the ability of competitors to attract customers by publicly advertising lower prices. Whether or not a retailer may actually offer a lower price by means such as a coupon or a "shopping cart" discount, MAPs prohibit them from advertising that lower price – thus, there is no incentive for competitors to lower prices when there is little chance for that lower price to be recouped by higher sales volume. Second, even if some retailers do offer discounts on the MAP prices, the industry-wide adoption of one price set unilaterally by the manufacturer operates to artificially inflate the "starting point" price from which any such discounts are calculated. In other words, the price of an Archery Product that is discounted from the MAP is still likely higher than the competitive price for that Product by operation of Defendants' conspiracy.

133.    As the ATA itself in encouraging its members, including the Manufacturer and Retailer Defendants, to adopt and strictly enforce these policies, "MAP policies that level the playing field for all retailers, and eliminate the 'race to the bottom' that would occur if retailers endlessly competed to reduce prices." ATA also stated that MAP policy "ensures all retailers compete fairly and evenly on service instead of price." As an example of the industry-wide recognition of this principle, Kinsey's stated "MAP policies exist to benefit both retailers and manufacturers by elevating perception of brand value, which leads to increased margins for retailers."

134.    Defendants' agreement to raise prices on Archery Products has had the intended effect. For example, NABA, who has sat on the ATA Board of Directors, stated that its members "stive for a minimum of 40% profit based on manufacturer's M.A.P[.]"

Another retailer recognized the effect of these de-facto price floors on competition: "Most archery shops are in areas where bow pricing is highly competitive from shop to shop. We all want to get the sale, but fortunately manufacturers set MAP pricing on bows, which mostly prevents one shop from grossly undercutting another on pricing. That way, we all get our piece of the pie."

135.    Defendants' exchanges of competitively sensitive information also had the effect of harming competition in the Archery Products market. Such information exchange suppresses competition by removing the veil of ignorance between retailers on prices, supply, demand, inventory, and other key factors which, in a competitive market, would force retailers to compete with one another on price, resulting in higher prices for the consumer.

136.    One tool that courts use to assess the competitive effects of concerted action is defining a relevant market – the zone of competition among the agreeing rivals in which the agreement may affect competition. A relevant market contains both a product dimension (the "product market") and a geographic dimension (the "geographic market").

137.    There is a single market for Archery Products. As alleged infra, the MAP policies created and enforced by Defendants applied to all categories and price points of Archery Products.

138.    The relevant geographic market is the United States.

139.    The Defendants have market power in the market for Archery Products. The Manufacturer Defendants are some of the most popular and ubiquitous brands in the Archery Products industry. Moreover, the Manufacturer Defendants also consistently held seats on the ATA Board of Directors and ATA Retail Council throughout the Class Period, which increased their already-large influence on the market for Archery Products.

140.    Similarly, Retailer Defendants are some of the largest sellers of Archery Products in the country. The beginning of the conspiracy was marked in large part by the appointment of Retailer Defendants Cabela's and Bass Pro Shops to the ATA Board of Directors, which caused ATA President Tom McAninch to reflect on the "mega marts

36

joining into our industry discussions" which "allowed our Board members to see that the box stores [Cabela's and Bass Pro Shops] shared in our future and, more important, were serious about contributing to the success of the archery and bowhunting industry." Moreover, the Retailer Defendants also consistently held seats on the ATA Board of Directors and ATA Retail Council throughout the Class Period, which increased their already-large influence on the market for Archery Products.

141.    A critical factor in assessing the impact of Defendants' information exchange is the fact that the Retailer Defendants are competing for sales of literally identical products – the products manufactured by the Manufacturer Defendants. Therefore, the only way that the Retailer Defendants compete for those customers is through price, which is precisely the competition that Defendants sought to thwart through their conspiracy.

142.    Competition is likely to be harmed where competitors exchange sensitive information on pricing and sales strategies. When Defendants that are competing for the same customers exchange their strategic plans, comfort replaces uncertainty and reduces incentives to lower price or compete on other aspects of sales or Archery Products.

143.    Competition was, in fact, harmed by Defendants' information exchange. ATA announced the stated purpose of ATA Connect, for example, to "work with your peers to find solutions that boost business and benefit the industry by tackling topics like MAP policies, buying patterns, and setting appropriate charges for service work." The ATA advertised its Retail Growth Interact channel as a "great place to share ideas and ask questions about the topics that matter most to your business, including buying patters [sic], profit margins and what to charge for services."

144.    Defendants used the strategic information obtained through the ATA and its various channels detailed infra to reduce the uncertainty that they each should have faced from not knowing what their competitors were doing in the market. This strategic information was a material factor in their decisions to create and vigorously enforce MAPs on the Archery Products they manufactured and sold to customers. Thus, this

knowledge tainted what should have been their independent decisions about the price and sales strategies of Archery Products.

145. Defendants' information exchange was mutually-reinforcing with its agreement to raise prices through industry-wide MAP policies. For example, the regular exchange of information, including through ATA-created channels such as ATA Connect, the Retail Business Tracker Survey, the ATA Board of Directors and Retail Council – on which representatives from Manufacturer and Retail Defendants sit and meet regularly – and the ATA Trade Show, allowed the Defendants to monitor one another's sales, prices, and other metrics to ensure that they were are adhering to the conspiracy. Additionally, where Defendants do adhere to MAPs and only "compete fairly on service instead of price," the value of the information relating to the prices of services and other non-price variables – information that is explicitly exchanged through, inter alia, the Retail Business Tracker Survey – becomes especially valuable.

146. The cumulative effect of Defendants' agreements is higher prices for consumers. A 2016 post on Archery Talk forum noted: "Every dealer I have ever talked to thinks everything in archery is overpriced today, just as I do! Today vertical bows are exceeding 1000-1500 [dollars] on a regular basis, a dozen crossbow arrows are over $80 and can cost up to 250 if you want custom work, firenock arrows are over $600 a dozen, vertical arrows are exceeding $200 for hunting arrows, don't get me started on target arrows, X10 Pro Tours are over $400 for bare shafts, points can be around $300. The average pay hasn't moved much in years." The retailer, a non-defendant retailer, concluded "[I]s archery overpriced[?] [A]bsolutely."

147. A 2017 issue of Field & Stream Magazine reported on consumer attitudes towards bow prices, reporting that customers believed that the prices for compound bows were "obscene," "insane," and "out of touch," and quoted one retailer saying "Guys around here can't afford new bows anymore." It stated "[t]he least expensive of our top 12 bows last year listed at $949. The priciest was $1,500. Add in arrows and accessories, and you're looking at $1,200 to $2K."

## ANTITRUST INJURY AND DAMAGES

148.     Defendants' anticompetitive conduct has had the following effects, among others:

a)     Price competition in the Archery Products market has been restrained or eliminated;

b)     Prices for Archery Products sold by the Manufacturer and Retailer Defendants and their divisions, subsidiaries, affiliates, or co-conspirators, in turn, have been raised, fixed, maintained, or stabilized at artificially high, noncompetitive levels throughout the United States;

c)     Direct purchasers of Archery Products have been deprived of free and open competition; and

d)     Direct purchasers of Archery Products have paid artificially inflated prices.

149.   The purpose of Defendants' and their co-conspirators' conduct is to raise, fix, maintain, or stabilize the price of Archery Products and, as a direct and foreseeable result, Plaintiff Carollo and the class have paid supracompetitive prices for Archery Products during the Class Period.

150.   By reason of the alleged violations of the antitrust laws, Plaintiff Carollo and Class Members have sustained injury to their businesses or property, having paid higher prices for Archery Products than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result, they have suffered damages. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## CLASS ACTION ALLEGATIONS

151.   Plaintiff Carollo brings Count I under Federal Rule of Civil Procedure 23(a) and (b)(2), as representative of a Class of Archery Product consumers seeking injunctive relief ("Nationwide Injunctive Relief Class") defined as:

> All persons and entities residing in the United States or its territories who purchased Archery Products (defined herein) directly from the named Defendants, any Archery Trade Association member, or any of their

coconspirators at any time between January 1, 2014, and the present (the "Class Period").

Plaintiff Carollo also brings Count I under Federal Rule of Civil Procedure 23(a), (b)(3), and/or (c)(5) as representative of a Class of Archery Product consumers seeking damages ("Nationwide Damages Class") defined as:

> All persons and entities residing in the United States or its territories who purchased Archery Products (defined herein) directly from the named Defendants, any Archery Trade Association member, or any of their coconspirators at any time between January 1, 2014, and the present (the "Class Period").

Specifically excluded from these Classes are Defendants; their officers, directors, or employees; any entity in which a Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of a Defendant; any federal, state, or local governmental entities; any judicial officers presiding over this action and members of their immediate family and staff; and any juror assigned to this action.

152. Plaintiff Carollo reserves the right to amend this Class definition, including, without limitation, the Class Period.

153. The above-defined Class Members are readily identifiable from information and records in the possession of Defendants.

154. Plaintiff Carollo does not know the exact number of Class Members because such information is presently in the exclusive control of the Defendants. Plaintiff Carollo believes that due to the nature of the trade and commerce involved, there are thousands of Class Members geographically dispersed throughout the United States, such that joinder of all Class Members would be impracticable.

155. Plaintiff Carollo's claims are typical of the claims of the members of the Class because Plaintiff purchased Archery Products directly from one or more of the Manufacturer or Retailer Defendants and were damaged by the same common course of wrongful conduct.

156.    There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members, including, but not limited to:

a. Whether Defendants and their co-conspirators engaged in a contract, combination, or conspiracy to raise, fix, maintain, or stabilize prices of Archery Products sold in interstate commerce in the United States in violation of federal antitrust laws;

b.    Whether Defendants agreed to unreasonably restrain trade in violation of federal antitrust laws.

c.    The identity of the participants of the alleged conspiracy;

d.    The scope and duration of the alleged conspiracy;

e.    The acts performed by Defendants and their co-conspirators in furtherance of the alleged conspiracy;

f.    The effect of Defendants' alleged conspiracy on the prices Archery Products sold in the United States during the Class Period;

g.    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff Carollo and other members of the Class;

h.    Whether Plaintiff Carollo and other members of the Class are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief;

i.    The appropriate class-wide measure of damages; and

j.    Whether the statute of limitations was tolled or whether Defendants fraudulently concealed the existence of their anticompetitive conduct from Plaintiff Carollo and the Class.

157.    Plaintiff Carollo will fairly and adequately protect the interests of the Class in that Plaintiff Carollo's interests are aligned with, and not antagonistic to, those of other members of the Class and Plaintiff has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent itself and the Class.

158.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all members of the Class is impractical and Class Members do not have interests in individually controlling the prosecution of separate actions. Prosecution as a class action will eliminate the possibility of duplicative litigation. The damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and the establishment of incompatible standards of conduct for Defendants and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court.

159.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

**FRAUDULENT CONCEALMENT & EQUITABLE TOLLING**

160.    Plaintiff Carollo and Class Members had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiff and Class Members did not discover and could not have discovered through the exercise of reasonable diligence the existence of the conspiracy alleged herein until shortly before filing this Complaint. Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiff or Class Members on inquiry notice that there was a conspiracy to fix prices for Archery Products.

161.    The contract, combination, or conspiracy alleged herein was fraudulently concealed by Defendants throughout the Class Period by various means and methods, including, but not limited to secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings to prevent the existence of written records, limitation of any explicit reference to competitor pricing,

communications on documents, communication of competitively sensitive data to one another through the members-only ATA-created channels detailed herein, which kept both the content and identity of participants in the system secret, and the concealment of the existence and nature of their competitor price discussions from non-conspirators (including customers).

162. Indeed, the very nature of Defendants' conspiracy was actively concealed by Defendants' use of the term "MAP" to describe what was actually a horizontal agreement to fix prices of Archery Products. Defendants used the term "MAP" to mislead customers into believing that Defendants' illegal coordinated conduct was a legitimate business practice.

163. Defendants also conducted the conspiracy through the ATA, which is members-only and whose Board of Directors and Retail Council meetings are closed even to most members.

164. Similarly, many of the veiled references to the ATA's facilitation of the conspiracy were removed from their website around 2021 and, without further context, would have been insufficient to put consumers on notice of Defendants' conspiratorial actions.

165. By virtue of the fraudulent concealment of their wrongful conduct by Defendants and all of their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiff Carollo and Class Members have as a result of the unlawful contract, combination, or conspiracy alleged in this complaint.

## CONTINUING VIOLATION

166. During the Class Period, Defendants continued to make sales to Plaintiff Carollo and Class Members of Archery Products whose prices were fixed as a result of Defendants' continually renewed and adjusted price-fixing and information exchange agreement. Defendants needed to continually renew and adjust their price fixing and information exchange agreement to account for ever-fluctuating economic and market conditions.

167.    Defendants' meetings and misrepresentations were overt acts that began a new statute of limitations because these events advanced the objectives of Defendants' conspiracy.

168.    Defendants' overt acts, which were new acts beyond the initial price fixing that were necessary to perpetuate Defendants' agreement, continued throughout the Class Period. Each sale of Archery Products by a Defendant at a supracompetitive price was a new overt act that was part of Defendants' antitrust violations that injured Plaintiff and Class Members and started the statutory period running again.

169.    Defendants' overt acts were new and independent acts that perpetuated their agreement and kept it current with market conditions; they were not merely reaffirmations of Defendants' previous acts. By constantly renewing and refining their agreement to reflect market conditions, Defendants inflicted new and accumulating injury on Plaintiff Carollo and Class Members.

170.    Further, each purchase by Plaintiff Carollo and Class Members through the Class Period of Defendants' Archery Products, the price which resulted from Defendants' continually renewed and adjusted price-fixing agreement, necessarily caused new and accumulating injury to Plaintiff Carollo and class members.

171.    As the concept of a continuing violation applies to a price-fixing conspiracy that brings about a series of unlawfully high-priced sales over a period of years, each sale to Plaintiff Carollo and Class Members starts the statutory period running again regardless of Plaintiff Carollo's knowledge of the alleged illegality at much earlier times. This means that each illegally priced sale of Archery Products to Plaintiff Carollo and Class Members constituted a new cause of action for purposes of the statute of limitations.

## CAUSES OF ACTION

### COUNT I:

### VIOLATIONS OF THE SHERMAN ACT, 15 U.S.C. §§ 1, 3

### VIOLATIONS OF THE CLAYTON ACT, 15 U.S.C. §§ 15(A), 26

#### (on behalf of the Nationwide Injunctive and Damages Classes)

172.     Plaintiff Carollo incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

173.     Beginning at a time currently unknown to Plaintiff Carollo, but at least as early as January 1, 2014, and continuing through the present, the exact dates being unknown to Plaintiff Carollo, Defendants and their co-conspirators entered into an unlawful and continuing contract, combination, or conspiracy in unreasonable restraint of trade to artificially raise, fix, maintain, or stabilize prices for Archery Products in the United States to supracompetitive levels, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

174.     In furtherance of this scheme, Defendants and co-conspirators have agreed between and among themselves to exchange competitively sensitive information such as prices, output, supplies, costs, and purchasing and sales strategies as well as by directly implementing, policing, and enforcing pricing policies.

175.     Defendants' agreement had the intended anti-competitive effects, including inter alia: (a) raising, fixing, maintaining, or stabilizing prices of Archery Products at an artificially high level; and (b) eliminating or suppressing, to a substantial degree, competition among the Manufacturer and Retailer Defendants for sales of Archery Products.

176.     This conduct is unlawful under the *per se* standard. Defendants' conduct is also unlawful under either a quick look or rule of reason analysis because the agreement is factually anticompetitive with no valid procompetitive justification. Moreover, even if there were valid procompetitive justifications, such justifications would have been reasonably achieved through less restrictive means of competition.

177. The contract, combination, or conspiracy alleged herein has had the following effects, among others:

a. Price competition in the sale of Archery Products has been restrained, suppressed, and/or eliminated in the United States;

b. Prices for Archery Products sold by the Manufacturer or Retailer Defendants have been raised, fixed, maintained, or stabilized at artificially high, non-competitive levels throughout the United States; and

c. Those who purchased Archery Products directly from the Manufacturer or Retailer Defendants or their co-conspirators have been deprived of the benefits of free and open competition.

178. Plaintiff Carollo and Class Members have been injured and will continue to be injured in their businesses and property by paying more for Archery Products purchased directly from the Manufacturer or Retailer Defendants or their co-conspirators than they would have paid and will pay in the absence of the contract, combination, or conspiracy.

179. Plaintiff Carollo and Class Members seek three times their damages caused by Defendant's violations of Section 1 and 3 of the Sherman Act, the costs of bringing suit, reasonable attorneys' fees, and a permanent injunction enjoining Defendant from ever again entering into similar agreements in violation of Section 1 of the Sherman Act by and through Sections 4 and 16 of the Clayton Act.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Carollo, individually and on behalf of the Class, respectfully requests judgment against Defendants, as follows:

1. That the Court enter an order declaring that Defendants' action, as set forth in this Complaint, violates the federal laws set forth above;

2. That the Court award damages, treble and multiple damages, interest, punitive damages, and/or restitution in an amount to be determined at trial;

3. That the Court issue appropriate injunctive and other equitable relief against Defendants;

4. That the Court award Plaintiff Carollo and the Classes pre- and post-judgment interest;

5. That the Court award Plaintiff Carollo the costs of suit, including reasonable attorneys' fees and expenses, including costs of consulting and testifying experts; and

6. That the Court award any and all such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff Carollo, individually and on behalf of the Class, hereby requests a jury trial pursuant to Federal Rule Civil Procedure 38(b) on any and all claims so triable.

Dated: August 12, 2025                Respectfully submitted,

**SCHMITT TEMPLIN, LLC**

*/s/ Nicolas V. Cirese*
Ben T. Schmitt       MO# 36828
Nicolas V. Cirese     MO# 74607
2600 Grand Blvd., Suite 380
Kansas City, Missouri 64108
Phone: 816-400-1000
Fax: 816-389-4015
ben@kansascitylawyers.com
cirese@kansascitylawyers.com

Jason S. Hartley (*pro hac vice forthcoming*)
Jason M. Lindner (*pro hac vice forthcoming*)
**HARTLEY LLP**
101 W. Broadway, Ste 820
San Diego, CA 92101
(619) 400-5822
hartley@hartleyllp.com
lindner@hartleyllp.com

*Attorneys for Plaintiff and the Proposed Class*